UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONDA GARMON,

        Plaintiff,                                Hon. Janet T. Neff

v.                                                     Case No. 1:13-CV-978

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 39 years of age on her alleged disability onset date and 40 years of age when her insured status expired. (Tr. 21, 127). She successfully completed high school and worked previously as a dental assistant, personal care attendant, housekeeper, and public transportation driver. (Tr. 30-31). Plaintiff applied for benefits on September 10, 2009, alleging that she had been disabled since August 3, 2009, due to aneurysms, hypertension, disequilibrium, memory loss, headaches, and blurred vision. (Tr. 125-30, 160). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 74-124). On March 28, 2011, Plaintiff appeared before ALJ Donna Grit with testimony being offered by Plaintiff and a vocational expert. (Tr. 38-73). In a written decision dated April 11, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 19-32). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2010. (Tr. 21); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

**RELEVANT MEDICAL HISTORY**

On August 3, 2009, Plaintiff reported to the emergency department "complaining of severe headaches for two weeks and blurred vision." (Tr. 229-30). A "urine drug screen came back as positive for cocaine." (Tr. 242). A CT examination of Plaintiff's head revealed:

> Diffuse irregularity of the left vertebral artery is concerning for vertebral artery dissection. Given the absence of calcification and other regions of abnormality, atherosclerotic vascular disease is considered less likely. Also considered less likely are congenital hypoplasia of the left vertebral artery, fibromuscular dysplasia, and vasculitis.

(Tr. 267). There was, however, "no CT evidence of intracranial hemorrhage or acute intracranial process." (Tr. 268). Plaintiff also participated in an MRI of her brain, an MR angiogram of her brain, and an MR angiogram of her neck the results of which revealed:

> MRI of the Brain:
>
> 1. There is no diffusion-restriction to suggest acute ischemia.
>
> 2. The brain parenchyma otherwise demonstrates normal signal intensity.
>
> 3. The sulci, ventricles and subarachnoid spaces demonstrate normal appearance without evidence of hydrocephalus.
>
> 4. The orbits, paranasal sinuses and mastoid air cells demonstrate an unremarkable appearance.
>
> MR Angiogram of the Brain:
>
> 1. The internal carotid arteries, anterior cerebral arteries and middle cerebral arteries demonstrate no evidence of significant aneurysm or stenosis.
>
> 2. The left vertebral artery demonstrates irregularity with suggestion of possible dissection flap (series #4 image #31, series #4 image #42). The right vertebral artery, basilar

    artery, and posterior cerebral arteries demonstrate no evidence of significant aneurysm or stenosis. Bilateral posterior communicating arteries are noted.

  MR Angiogram of the Neck:

  1. Crescentic T1 signal hyperintensity is demonstrated adjacent to the left vertebral artery (series #3 image #7) on the dissection sequences; note that similar increased signal intensity is also noted adjacent to the bilateral carotid arteries, although this appears symmetric and felt more likely to represent venous contamination (series #4 image #7).

  2. The common carotid arteries, internal carotid arteries and proximal external carotid arteries demonstrate no significant aneurysm or stenosis. Irregularity of the intracranial left vertebral artery is again suggested. The vertebral arteries otherwise demonstrate no evidence of significant aneurysm or stenosis.

  Impression:

  1. In conjunction with the findings on the prior CT angiogram of the brain, these findings are most consistent with distal left vertebral artery dissection.

  2. The brain demonstrates no evidence of ischemia.

  3. MR angiogram of the brain and MR angiogram of the neck demonstrate findings that confirm the presence of vertebral artery dissection. No other evidence of aneurysm or dissection is definitively identified.

  4. Consideration of catheter-directed angiography is recommended on a nonurgent basis.

(Tr. 269-70).

Treatment notes dated September 2, 2009 indicate that Plaintiff "does seem to be getting better" and was " cocaine free." (Tr. 293). Treatment notes dated October 5, 2009, indicate that Plaintiff was "doing much better." (Tr. 291).

On November 3, 2009, Plaintiff participated in a CT angiogram of her head the results of which revealed:

> Review of images demonstrates the previously demonstrated pseudoaneurysms involving the distal vertebral artery have healed. There is no longer any evidence of the arterial wall abnormality of the distal vertebral artery. The remainder of the cerebral vasculature is normal, as well.

(Tr. 253).

Plaintiff was subsequently instructed to participate in physical therapy, but after three sessions Plaintiff stopped attending. (Tr. 281-88).

On January 18, 2010, Plaintiff participated in a consultive examination conducted by Julia Petros, Ph.D. (Tr. 302-05). Plaintiff reported that she was disabled due to headaches. (Tr. 302). Plaintiff also reported that she "used to be hanging out with the wrong people" and "had been using cocaine, marijuana and alcohol." (Tr. 303). When asked to describe her activities on a "typical day," Plaintiff responded as follows:

> Well, when I wake up, I'm not really sure about the time or the day. If I realize its morning, I'll wake up. Sometimes, I'll sleep most of the day. I take my pills. Sometimes, I've wet the bed a few times and my husband immediately asks if I have to go to the bathroom. He does all the cooking and the cleaning. Sometimes, I'll just go back to bed. Sometimes, I'll get up and watch TV and then go back to bed. I fall asleep a lot. I have fallen asleep in the tub and on the toilet before.

(Tr. 303). The doctor also observed the following:

> [Plaintiff] presented as using a walker and was slow to sit and stand. She produced an unsteady gait. Ms. Garmon indicated that she did need help getting to her appointment. She indicated her husband drove her here and accompanied her up to the office. Ms. Garmon initially wore sunglasses during the first several minutes of the appointment. She asked if the lights could be turned off so that she

6

> could speak to me without the sunglasses. She indicated that she had a migraine at the time of the interview.

(Tr. 303). The results of a mental status examination were unremarkable. (Tr. 304-05). Plaintiff was diagnosed with adjustment disorder with depressed mood, cocaine abuse (early partial remission), and cannabis abuse (early partial remission). (Tr. 305). Plaintiff's GAF score was rated as 71.[1] (Tr. 305).

Records indicate that Plaintiff was scheduled to participate in a consultive examination with Dr. June Hillelson on January 29, 2010, but Plaintiff was a "no show." (Tr. 321).

On March 4, 2010, Plaintiff was examined by Dr. R. Scott Lazzara. (Tr. 324-28). Plaintiff reported that she was disabled due to "aneurysms with a dissection, hypertension, disequilibrium, slight loss of memory, headaches, [and] vision." (Tr. 324). Plaintiff reported she last worked in September 2009 as a dental assistant, but "was let go at the time because of lack of work." (Tr. 324). Plaintiff reported that "she can do her activities of daily living," but "does use a walker 100% of the time." (Tr. 324). Plaintiff also reported that "she does cook on occasion and will occasionally do some dusting." (Tr. 324). A musculoskeletal examination revealed the following:

> There is no evidence of joint laxity, crepitance, or effusion. Grip strength remains intact. Dexterity is unimpaired. The patient could pick up a coin, button clothing, and open a door. The patient had mild difficulty getting on and off the examination table, severe difficulty heel and toe walking, severe difficulty performing a partial squat, and was unable to hop. Straight leg raising is negative. There is no paravertebral muscle spasm.

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 71 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning." *Id.* at 34.

(Tr. 325). A neurological examination revealed the following:

> Cranial nerves are intact. Motor strength and tone are normal. Sensory is intact to light touch and pinprick. Romberg testing[2] is negative but with an unsteady station. The patient walks with an ataxic gait without the use of an assist device.

(Tr. 327).

Treatment notes dated May 10, 2010, indicate that Plaintiff's previous aneurysms "have now resolved." (Tr. 361).

On May 18, 2010, Plaintiff reported to the emergency room complaining of "a severe headache." (Tr. 344). The neurologist which examined and treated Plaintiff reported the following:

> When she came to the emergency department, her comprehensive metabolic panel was normal, CBC was normal. Toxicology screen was positive for benzodiazepines and cannabinoids. CT of the brain was obtained and was normal. Because of her history of dissection, she had a CT of the neck which showed that the irregularity that was noted in her August 3, 2009, left vertebral dissection had resolved and it was unchanged from the follow-up imaging that she had had in November of 2009. No evidence of any other dissection was noted in the neck. The CTA of the brain showed "possible" minimal beading of a branch of the left callosal marginal artery. The interpreting radiologist indicated that this can be seen in vasculitis secondary to cocaine or amphetamines but, again, the term "possible" suggests that this was somewhat equivocal and not definite.

(Tr. 346). The doctor concluded as follows:

ASSESSMENT

1. Normal neurologic examination.

---

[2] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on May 29, 2014). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

2. Headache, the etiology of which is unclear and it is improved; there is no evidence of dissection and she has no past history of migraine.

3. History of left vertebral dissection and pseudoaneurysm in August of 2009 with subsequent imaging showing resolution of the dissection.

4. Hypertension.

5. Substance abuse.

RECOMMENDATIONS

1. CT of the brain was accomplished and I have reviewed those report of images and it is normal and shows no evidence of subarachnoid hemorrhage.

2. CT of the neck and CTA of the head I discussed above; I am highly skeptical that this patient has a vasculitis.

3. For completeness sake, a lumbar puncture could be done to be absolute certain that there was no subarachnoid hemorrhage but I think it is highly unlikely.

4. Would observe for another day and if her headache clears, she could be discharged home.

(Tr. 348).

Treatment notes dated May 27, 2010, indicate that Plaintiff was continuing to use alcohol and marijuana, having consumed both the previous day. (Tr. 353). Plaintiff also reported that she had multiple prescriptions, to treat her depression and headaches, which she had not filled. (Tr. 354). Treatment notes dated June 3, 2010, indicate that Plaintiff was prescribed medication to treat her depression, but that "she had not obtained it." (Tr. 358). Treatment notes dated December 3, 2010, indicate that Plaintiff was not taking her prescribed medications. (Tr. 380).

9

On February 11, 2011, Plaintiff reported to the emergency room complaining of headaches. (Tr. 381-400). A CT examination of Plaintiff's head was "negative." (Tr. 382). Plaintiff was given Valium and Dilaudid after which she was "resting more comfortably." (Tr. 382). Plaintiff was also examined by a psychiatrist who observed the following:

> This 41-year-old female was admitted to the medical service for acute-on-chronic headaches. She said she had 7/10. She does have a history of vertebral aneurysm rupture in 2009 with evidence of 2 aneurysms in the left vertebral artery.
>
> She also has a history of substance-related disorders including marijuana, alcohol, cocaine and perhaps narcotics. She has received 7 doses per day of hydromorphone for headache. She did not complain of headache when I saw her although she continues to complain of 10/10 pain.
>
> She does not have any significant psychiatric history either admission or followup. She is currently on Celexa, dose unknown. She also takes Valium intermittently when she can afford it.

(Tr. 383). The doctor diagnosed Plaintiff with: (1) depressive disorder, not otherwise specified; (2) history of cocaine dependence; (3) cannabis dependence; and (4) possible opioid dependence. (Tr. 384).

Treatment notes dated March 7, 2011, indicate that Plaintiff's aneurysm "is completely healed" and that "now our job is to wean her off her narcotic[s] and benzos." (Tr. 402). On March 11, 2011, Plaintiff was instructed to "increase her exercise level, improve her dietary intake," and "immediately discontinue" her use of pain medications. (Tr. 418).

On March 15, 2011, Dr. Laura VanderMolen completed a questionnaire regarding Plaintiff's residual functional capacity. (Tr. 405-07). The doctor reported that during an 8-hour workday, Plaintiff can sit, stand, and walk for one to two hours each. (Tr. 406). The doctor reported

10

that Plaintiff required a sit-stand option. (Tr. 406). The doctor also reported that Plaintiff's headaches would prevent her from "performing even basic work activities" and that she would be required to take "unscheduled breaks" of two hour duration during the workday. (Tr. 406). Finally, the doctor reported that as a result of her impairments Plaintiff would "be absent from work...more than four times a month." (Tr. 407).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable

---

[3] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

   The ALJ determined that as of the date Plaintiff's insured status expired Plaintiff suffered from: (1) status post healed aneurysms; (2) hypertension; (3) complaints of balance problems; (4) complaints of memory loss; (5) headaches; (6) complaints of vision disturbances; and (7) an adjustment disorder with depression, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 21-24).

   The ALJ next determined that Plaintiff, as of the date her insured status expired, retained the capacity to perform light work subject to the following limitations: (1) she can lift 20 pounds occasionally and 10 pounds frequently; (2) she can stand and walk for two hours during an 8-hour workday; (3) she can sit for six hours during an 8-hour workday; (4) she can never climb ladders, ropes, or scaffolds; (5) she can perform "less than frequent" climbing of ramps and stairs; (6) she can perform "less than frequent" balancing, stooping, kneeling, crouching, and crawling; (7) she should avoid all exposure to hazards such as heights and machinery; (8) she can only work in

environments with "moderate or less" noise and intensity levels; (9) she cannot work around strobe lights; and (10) can perform only simple, routine, and repetitive tasks. (Tr. 24).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed in the state of Michigan approximately 34,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 63-69). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The vocational expert further testified that if Plaintiff were further limited to the performance of sedentary work there still existed approximately 8,300 jobs which she could perform. (Tr. 69-70). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

**I.        The ALJ's RFC Determination is Supported by Substantial Evidence**

Plaintiff argues that she is entitled to relief because the ALJ failed to perform a "function-by-function evaluation of [her] work-related abilities and articulate how the evidence of record supports the RFC determination" as required by Social Security Ruling 96-8p. Social Security Ruling 96-8p provides that in determining a claimant's RFC, the ALJ must "assess [the claimant's] work-related abilities on a function-by-function basis." *See* Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184 at *1 (S.S.R., July 2, 1996).

As the Sixth Circuit has recognized, however, while a "function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 547 (6th Cir., Mar. 4, 2002) (citation omitted). Rather, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.* (citation omitted), *see also*, *Rudd v. Commissioner of Social Security*, 2013 WL 4767020 at *9 (6th Cir., Sept. 5, 2013) (SSR 96-8p merely requires the ALJ to "address a claimant's exertional and nonexertional capacities and also describe how the evidence supports her conclusions").

The ALJ discussed at length the evidence of record and how such supported her RFC determination. (Tr. 22-30). Specifically, the ALJ found that Plaintiff's previous aneurysms had "healed" and that Plaintiff subsequently "had little clinical or radiological evidence of ongoing problems." (Tr. 25). The ALJ noted that Plaintiff's allegation that she required a walker to ambulate was not supported by the record. (Tr. 25-26). The ALJ noted that Plaintiff received only "minimal

14

treatment for her alleged psychiatric problems." (Tr. 28). The ALJ also noted that the record failed to support Plaintiff's allegations of disabling headaches. (Tr. 22-30). The ALJ's rationale is supported by substantial evidence and is consistent with the authority identified above. Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

### II.        The ALJ Properly Discounted the Opinion of Dr. VanderMolen

As noted above, Dr. VanderMolen reported that during an 8-hour workday, Plaintiff can sit, stand, and walk for only one to two hours each and, moreover, required a sit-stand option. The doctor also reported that Plaintiff's headaches would prevent her from "performing even basic work activities" and that she would be required to take "unscheduled breaks" of two hour duration during the workday. Finally, the doctor reported that as a result of her impairments Plaintiff would "be absent from work...more than four times a month." The ALJ accorded "little weight" to Dr. VanderMolen's opinion. (Tr. 29). Plaintiff asserts that she is entitled to relief because the ALJ improperly discounted the opinions of her treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the

examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

The ALJ discussed in detail the opinions offered by Dr. VanderMolen as well as the other evidence of record. (Tr. 22-30). As the ALJ concluded, the doctor's opinions are "not well supported by medically acceptable clinical and laboratory diagnostic techniques." (Tr. 29). The ALJ also observed that the doctor's opinions were "not consistent with the other substantial evidence in the case record." (Tr. 29). Specifically, as the ALJ observed:

> Claimant's aneurysms had healed by November 2009, as evidenced on the objective CT angiogram. Moreover, by May 2010, less than twleve months from her alleged onset date, her neurological examination was normal and her imaging remained stable. Her subsequent visits indicated her clinical exams remained mostly normal and her imaging continued to show healed aneurysms. Furthermore, although Dr. VanderMolen indicated claimant could not walk or stand more than 1-2 hours, the neurologist wanted her to increase her exercise level and immediately discontinue the use of pain medications.

(Tr. 29).

The ALJ's rationale is supported by substantial evidence and complies with the aforementioned legal standard. In sum, the ALJ's conclusion to afford less than controlling weight to Dr. VanderMolen's opinions is supported by substantial evidence.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: June 4, 2014 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge